**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. 3:22-CV-335-RJC-DCK**

| | | |
|---|---|---|
| **FRIEDLAM PARTNERS, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| **v.** | ) | |
| | ) | |
| **LERNER AND COMPANY REAL ESTATE, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**THIS MATTER IS BEFORE THE COURT** on "Defendants' Motion To Dismiss" (Document No. 7). This motion has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. §636(b), and is ripe for disposition. Having carefully considered the arguments, the record, and applicable authority, the undersigned will respectfully recommend that the motion be denied without prejudice.

## I. BACKGROUND

Friedlam Partners, LLC ("Plaintiff" or "Friedlam") and Defendants entered into a "Purchase And Sale Agreement" (Document No. 1-1) (the "Contract") on or about February 15, 2022. (Document No. 1, p. 5). "Plaintiff owns, develops, and manages multi-family residential properties throughout the United States." (Document No. 1, p. 2). "Defendants are a variety of limited liability companies and individuals that own individual multi-family residential properties located in North Carolina, family real estate trusts with ownership interests in various multi-family properties, and individual family members." (Document No. 1, pp. 2-3). Under the Contract, Plaintiff would acquire from Defendants ten (10) multi-family properties located in Charlotte, North Carolina. Id.; see also (Document No. 1-1, pp. 29-30).

The Purchase price for the properties under the Contract was $198,500,000.00, and required an initial payment ("Earnest Money") of $1,000.000.00. (Document No. 1, p. 5) (citing Document No. 1-1, p. 3). Plaintiff later submitted an additional payment of $1,000.000.00, bringing the total Earnest Money to $2,000,000.00. Id. "Under Paragraph 3.1, Purchaser had the right until the Closing Date to enter onto the various properties at issue to conduct inspections in a variety of issues, including environmental inspections." Id. (citing (Document No. 1-1, p. 4-5). If an inspection identified a "Material Adverse Condition," "Plaintiff had the right to immediately terminate the agreement and receive a complete refund of its Earnest Money." (Document No. 1, p. 6); see also (Document No. 1-1, p. 4).

> As a part of the inspection process, BBG Assessments ("BBG") was retained to conduct a Phase I Environmental Site Assessment for the Lake Hill Apartments site. In its March 24, 2022, report ("Phase I Report"), BBG identified a 17.5 acre "Brownfields property" (report at P. 2) extending along the northwest boundary of the Lake Hill Apartments property.

(Document No. 1, p. 7). A sub-surface assessment was then done that "revealed that multiple drycleaners as well as a gas station utilized the adjacent property" and that "[t]he release of dry-cleaning chemicals and above ground and underground storage tanks have created a plume impacting the groundwater under adjacent properties impacting the subject properties including the Lake Hill property." Id.

Plaintiff asserts that "remediation and cleanup of such plume and related environmental matters or impacts on the property, would cost well over $50,000.00, and thus, Plaintiff is entitled to return of its Earnest Money." (Document No. 1, p. 8). Plaintiff further asserts that "Defendants were aware or should have been on notice of environmental issues and impacts on the subject properties because a 'Notice of Brownfields' [was] filed with the Mecklenburg County Register of Deeds on March 19, 2007, related to the subject properties and property adjacent the subject

properties." Id.  The Complaint indicates that Harry Lerner, as President of Lake Hills Corporation, signed an acknowledgment "of the Notice of Brownfields Agreement concerning the Lake Hill Apartment property" on or about December 7, 2006. Id. (citing Document No. 1-2). As such, "Defendants knew or should have known of the environmental contamination of the property in question." Id.

"[D]uring the Phase I Assessment of the Lake Hill Apartment property, Defendants stated that they had no records or recollections of releases . . . [and] stated that they were unaware of any environmental issues."  (Document No. 1, p. 9).  Plaintiff contends that "[b]y failing to produce records related to the Acknowledgment Defendants misrepresented the lack of environmental issues with the property." Id.

The parties "entered into a First Amendment to Purchase and Sale Agreement (the "Amendment")" on April 18, 2022.  (Document No. 1, p. 9) (citing Document No. 1-3).  In the Amendment, "Defendants agreed to allow Plaintiff to conduct a 'Phase II' environmental assessment consistent with the recommendations contained in the Phase I Report." Id.  "On May 4, 2022, BBG issued its 'Phase II Limited Environmental Site Assessment' ("Phase II Report")," finding that "the Lake Hill Apartments property had been impacted by contamination from gas station and dry-cleaning operations and found that the property had been impacted by hazardous chemicals." Id.

As a result of the Phase II Report findings, on or about May 12, 2022, "Plaintiff exercised its option to terminate under Paragraph 3.1 of the Agreement for the presence of a Material Adverse Condition and requested return of its Earnest Money."  (Document No. 1, p. 10). Defendants refused to return the Earnest Money. Id.

Plaintiff Friedlam initiated this action with the filing of a Complaint on July 25, 2022. (Document No. 1). The Complaint asserts claims for: (1) breach of contract; (2) negligent misrepresentation; (3) fraudulent misrepresentation; and (4) unfair and deceptive trade practices. (Document No. 1, pp. 10-13). The Complaint alleges that Defendants were negligent in failing to disclose information about environmental contamination, "or alternatively have engaged in a scheme to withhold Plaintiff's earnest money, breaching the Agreement, and unjustly enriching themselves to Plaintiff's detriment." (Document No. 1, p. 10).

Now pending before the Court is "Defendants' Motion To Dismiss" (Document 7) filed on October 24, 2022, along with a "Memorandum In Support…" (Document No. 8). Defendants seek dismissal of Plaintiff's Complaint "in its entirety" pursuant to Fed.R.Civ.P. 12(b)(6). (Document No. 7, p. 10). Plaintiff's "Response Memorandum In Opposition…" (Document No. 23) was filed on November 21, 2022; and "Defendants' Reply Memorandum In Support…" (Document No. 27) was filed on December 12, 2022.

The pending motion has been fully briefed and is ripe for review and a recommended disposition to the Honorable Robert J. Conrad, Jr.

## II. STANDARD OF REVIEW

A motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) tests the "legal sufficiency of the complaint" but "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992); Eastern Shore Markets, Inc. v. J.D. Assoc. Ltd. Partnership, 213 F.3d 175, 180 (4th Cir. 2000). A complaint attacked by a Rule 12(b)(6) motion to dismiss will survive if it contains "enough facts to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see also, Robinson v.

American Honda Motor Co., Inc., 551 F.3d 218, 222 (4th Cir. 2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id.

The Supreme Court has also opined that

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Specific facts are not necessary; the statement need only "'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" In addition, when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint.

Erickson v. Pardus, 551 U.S. 89, 93-94 (2007) (quoting Twombly, 550 U.S. at 555-56).

"Although for the purposes of this motion to dismiss we must take all the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986). The court "should view the complaint in the light most favorable to the plaintiff." Mylan Labs, Inc. v. Matkar, 7 F.3d 1130, 1134 (4th Cir. 1993).

## III. DISCUSSION

By the pending motion, Defendants contend that Plaintiff has not plausibly alleged facts to support any of its claims. (Document No. 7). Defendants describe this action as a "straightforward contractual dispute about who is entitled to receive funds placed in escrow for a real estate transaction that did not close." (Document No. 8, p. 1). According to Defendants, "[t]he contract contained detailed provisions for the deposit and disbursement of escrow funds, as well as the processes by which disputes over those funds were to be resolved." Id. Defendants contend that

explicit language in the Contract, and Plaintiff's failure to allege sufficient facts, require dismissal of Plaintiff's Complaint.  (Document No. 8, p. 2).

## A.  Misrepresentation and UDTPA Claims

1.  <u>Liability Limitations in Contract</u>

In their first argument, Defendants assert that the plain language of the Contract "prohibits claims based on the representations made by Defendants related to the Contract."  (Document No. 8, p. 9).  In support, Defendants include the following excerpt from the Contract:

> Purchaser hereby covenants that it will bring no action of any kind against such individual or any direct or indirect shareholder, partner, or member of a Seller related to or arising out of the representations and warranties set forth in this Agreement.

<u>See</u> <u>Id.</u> (quoting Ex. A, § 9.1, (Document No. 1-1, p. 13)).

Defendants note that "Plaintiff bases its entire Complaint on Defendants' purported representations related to the Contract."  (Document No. 8, p. 10).  "Specifically, Plaintiff accuses Defendants of 'suppl[ying] Plaintiff with incorrect and inadequate information regarding the presence of environmental contamination at the subject properties.'"  <u>Id.</u> (quoting Document No. 1, ¶ 58);  <u>see also</u> (Document No. 1, ¶¶ 43, 63, 71).

Defendants further note that Plaintiff's claims arise out of representations and warranties set forth in the Contract stating that Defendants had no knowledge of "Hazardous Materials" "on, in, under or emanating from the Properties" or any "actual knowledge of any environmental condition" that could give rise to liability.  (Document No. 8, pp. 10-11) (citing Ex. A, § 9.1 (h), (Document No. 1-1, pp. 12-13)).  Defendants contend that in the last paragraph of the same section of the Contract Plaintiff "covenanted that it would **not** sue the Defendants for those various representations."  (Document No. 8, p. 11) (citing Ex. A, § 9.1, (Document No. 1-1, p. 13)).

6

Defendants argue that Plaintiff is impermissibly "trying to renege on its covenant not to sue," but that "the Contract's language unambiguously prohibits the very claims that Plaintiff seeks to assert in this action." Id. Defendants further argue that a covenant not to sue must be enforced. (Document No. 8, p. 10) (citing McNair v. Goodwin, 136 S.E.2d 218, 223 (N.C. 1964); Harshaw's Ex'rs v. Woodfin, 64 N.C. 568, 569–70 (1870); VF Jeanswear Ltd. P'ship v. Molina, 320 F.Supp. 2d 412, 420 (M.D.N.C 2004)).

Next, Defendants argue that "even if the covenant not to sue did not exist, Plaintiff's UDTPA and Misrepresentation Claims against the Individual Defendants still fail as a matter of law because the parties expressly disclaimed personal[] liability in the Contract." Id. Defendants argue that the following language "of the Contract forbids Plaintiff from bringing claims against the Individual Defendants in their personal capacity":

> Each of Purchaser and Seller, for itself and on behalf of its agents, members, partners, employees, representatives, related and affiliated entities, successors and assigns, hereby agrees that **in no event shall any of the officers, directors, employees, agents, consultants, representatives or attorneys of the other party or any direct or indirect owner of any beneficial interest of the other party have any personal liability under this Agreement** or under any of the Closing documents and each of Purchaser and each Seller hereby expressly release and waive all such liability. In addition, **neither Seller nor Purchaser shall be entitled to recover from the other party any punitive, consequential, special or speculative damages**. Purchaser and Seller acknowledge and agree that the limitation on the liability of the parties set forth in this Section 9.5 shall be applicable to any claim, liability or cause of action under this Agreement, the Closing documents or any of the other documents executed in connection with this Agreement . . .

(Document No. 8, pp. 11-12) (quoting Ex. A, § 9.5, (Document No. 1-1, p. 15)) (emphasis added).

Defendants contend that Plaintiff has ignored this provision by suing various Individual Defendants related to the Contract. (Document No. 8, p. 12).

7

In addition, Defendants contend that the provisions of the Contract limit potential liability to only Lerner and Company Real Estate because each Seller is only responsible for their own representations about their own property. Id. (citing Ex. A, § 9.1, (Document No. 1-1, pp. 11-12) ("each Seller, individually, solely as to such Seller and the Property owned by it and not as to any other Seller or any other Property, hereby makes the following representations and warranties to Purchaser"). Defendants argue that Plaintiff ignored this provision and is accusing "every Defendant of misrepresenting the environmental condition of the Lake Hill Apartments leasing office property." (Document No. 8, p. 13).

In response, Plaintiff first notes that "[e]xculpatory provisions are construed against the party seeking their enforcement." (Document No. 23, p. 9) (citing Schenkel & Schultz, Inc. v. Hermon Fox & Assoc., 362 N.C. 269, 274 (2008) ("it is a universal rule that such [an] exculpatory clause is strictly construed against the party asserting it.")). Plaintiff then attempts to distinguish the McNair, Harshaw's, and VF Jeanswear Ltd. cases cited by Defendants. (Document No. 23, pp. 10-11). In that discussion, Plaintiff asserts that Defendants had notice of the contamination through acknowledgment of the Brownfields Agreement documents sent to them but "affirmatively represented otherwise to Plaintiff." (Document No. 23, p. 10) (citing Document Nos. 1-1 and 1-2).

Plaintiff states that:

> Defendants had notice of contamination of the adjacent property and the release of drycleaning solvents and petroleum constituent compounds through acknowledgment of a Brownfields Agreement documents sent to them and affirmatively represented otherwise to Plaintiff. (See Compl. Ex. A. and B.) They knew the plume of contamination was moving onto the subject property. Then, after Defendants' trap had been sprung on Plaintiff, Defendants refused to return the two million dollars of escrow funds that Plaintiff was entitled to after finding the contamination on the property.

(Document No. 23, p. 10).

Plaintiff concludes that because Defendants' cited cases are distinguishable, and because the exculpatory provisions should be strictly construed against Defendants, the claims here should be allowed to proceed to discovery. (Document No. 23, p. 11).

In the reply brief, Defendants assert that Plaintiff has failed to respond to most of their arguments and thereby abandoned or conceded those issues. (Document No. 27, p. 3) (citing Moran v. Polk Cnty., 1:18-CV-300-MR-WCM, 2019 WL 5297027, at *4 (W.D.N.C. Sept. 3, 2019)). Defendants note that Plaintiff failed to address their argument that Section 9.5's personal liability waiver bars claims against Individual Defendants. Id. (citing Document No. 8, pp. 11-12). Therefore, Defendants argue that "the Court must dismiss all claims against the Individual Defendants because the parties explicitly agreed in the Contract to waive any personal liability for "**any direct or indirect owner of any beneficial interest of the other party**." Id. (citing Ex. A, § 9.5, Document No. 1-1, p. 15).

Defendants further note that Plaintiff "fails to contest (or even acknowledge) that the Contract holds each Defendant responsible **only** for the property that it owns and the representations made concerning **only** that property." (Document No. 27, p. 4) (citing Document No. 23, p. 16 and Ex. A, § 9.1, Document No. 1-1, pp. 11-13). As such, Defendants contend that the Court must dismiss the UDTPA and misrepresentation claims against all Defendants other than Lerner and Company Real Estate. Id.

2. <u>Sufficiency of Plaintiff's Allegations of Reliance</u>

Defendants' second argument for dismissal of Plaintiff's misrepresentation claims argues that Plaintiff failed to allege reasonable or justifiable reliance to its detriment. (Document No. 8, pp. 13-20). Both misrepresentation claims "require either justifiable or reasonable reliance," "[y]et

Plaintiff's Complaint lacks any factual allegation that would be necessary to support **any** reliance on Defendants' alleged misrepresentations." (Document No. 8, p. 14).

Defendants provide the following legal authority in support of their motion.

> To state a claim of negligent misrepresentation under North Carolina law, a plaintiff must prove it (1) justifiably relied to its detriment (2) on information prepared without reasonable care and (3) by a person who owed the relying party a duty of care. *SunTrust Mortg., Inc. v. Busby*, 651 F.Supp.2d 472, 485 (W.D.N.C. 2009) (citing *Hudson-Cole Dev. Corp. v. Beemer*, 511 S.E.2d 309 (N.C. Ct. App. 1999)). Further, to state a claim for fraudulent misrepresentation under North Carolina law, a plaintiff must allege that defendants made a "(1) false representation or concealment of material fact, (2) that was reasonably calculated to deceive, (3) which was made with the intent to deceive, (4) that did in fact deceive, and (5) resulted in damage [to plaintiff]." *Bonham v. Wolf Creek Acad.*, 767 F. Supp. 2d 558, 568 (W.D.N.C. 2011) (citing *Jolly v. Acad. Collection Serv.*, 400 F. Supp. 2d 851 (M.D.N.C. 2005)). Similar to a negligent misrepresentation claim, a party must reasonably rely on alleged misrepresentations to state a fraudulent misrepresentation claim. *Forbis v. Neal*, 649 S.E.2d 382, 387 (N.C. 2007) (citing *Johnson v. Owens*, 140 S.E.2d 311, 313 (N.C. 1965)).

(Document No. 8, p. 14).[1]

According to Defendants, Plaintiff's own allegations show that it "**did not rely** on Defendants' representations and warranties concerning the state of the property" because it "commissioned two environmental studies, the Phase I and Phase II, to confirm the environmental condition of the Lake Hill Apartments property." (Document No. 8, pp. 14-15) (citing Document No. 1, ¶¶ 31, 46). Defendants contend that without "allegations of actual, detrimental reliance on any alleged misrepresentations, Plaintiff's Misrepresentation Claims necessarily fail." (Document No. 8, p. 15). Defendants further contend that any reliance by Plaintiff on the alleged misrepresentation was not to Plaintiff's detriment. (Document No. 8, p. 16). Moreover,

---

[1] The Forbis decision also notes that "[t]he reasonableness of a party's reliance is a question for the jury, unless the facts are so clear that they support only one conclusion." Forbis, 649 S.E.2d at 387.

Defendants assert that the Complaint does not allege that they denied Plaintiff the opportunity to investigate the property or induced Plaintiff to forego additional investigation. (Document No. 8, pp. 17-18).

Next, Defendants argue that even if Plaintiff alleged detrimental reliance on the alleged misrepresentation(s), such reliance was neither justifiable nor reasonable based on the "defined limitation of 'Seller's knowledge' under the Contract." (Document No. 8, pp. 16-17). Defendants note that the Contract limits the representations made to "Seller's knowledge," defined as the "actual, present, conscious knowledge of Mark Lerner . . . as to a fact at the time given **without any investigation or inquiry**." (Document No. 8, p. 18) (quoting Ex. A, § 9.1 (Document No. 1-1, p. 13). Therefore, Defendants take the position that Plaintiff could not have reasonably relied on any representations by Defendants because Defendants' knowledge pursuant to the Contract was whatever knowledge one Defendant, Mark Lerner, possessed "without any investigation or inquiry." (Document No. 8, pp. 18-19).

As described above, Plaintiff's response to Defendants' arguments for dismissal of the misrepresentation claims initially focuses on a few cases cited by Defendants. (Document No. 23, pp. 9-11). Defendants correctly note that the response provides little, if any, discussion related to Defendants' arguments regarding reliance as an element of the misrepresentation claims. However, Plaintiff suggests that it has asserted sufficient "facts of affirmative misrepresentation of the condition of the property and that the Defendants engaged in a scheme to withhold the earnest money for which they have no right." (Document No. 23, p. 11).

Later in the response brief, Plaintiff adds additional arguments in support of its negligent misrepresentation and fraudulent misrepresentation claims.[2]  See (Document No. 23, pp. 14-16). Plaintiff contends that its allegations in support of the misrepresentation claims are adequate to survive Rule 12(b)(6) scrutiny.  Id.

In support of negligent misrepresentation, Plaintiff cites North Carolina caselaw that holds that "a party to a contract owes the other contracting party a separate and distinct duty not to provide false information to induce the execution of the contract."  (Document No. 23, p. 14) (citing T.W.T. Distributing, Inc. v. Johnson Products Co., Inc., 3:13-CV-171-RJC-DSC, 966 F.Supp.2d 576, 582 (W.D.N.C. 2013) (quoting Schumacher Immobilien Und Beteiligungs AG v. Prova, Inc., 2010 WL 3943754, *2 (M.D.N.C. Oct. 7, 2010)).  Plaintiff argues that "[h]ere, that is exactly what the Defendants did – supply Plaintiff with false information about environmental contamination on the property such that when Plaintiff went through the due diligence period with its lender, Plaintiff found out about the contamination late in the process a[n]d was caught off guard by the contamination of the Lake Hills Apartments property…."  Id.  Plaintiff concludes that it has "sufficiently and plausibly alleged its negligent misrepresentation claim," but if "the Court finds insufficient detail, then the Court should allow amendment to the Complaint."  (Document No. 23, p. 15).

In support of its fraudulent misrepresentation claim, Plaintiff argues that it has adequately alleged that "Defendants' representations were false and were intentionally made and made with the intent to deceive the Plaintiff and did deceive the Plaintiff," and that "Plaintiff suffered

---

[2]  The undersigned notes that Plaintiff's "Response Memorandum…" is organized very differently than the "Memorandum In Support Of Defendants' Motion To Dismiss."  Plaintiff's counsel is respectfully advised that the brief's somewhat scattered organization – that does not "match" with the brief it is responding to – is not helpful to the Court's consideration.

damages as a result of the Defendants actions."  (Document No. 23, p. 16) (citing Document No. 1, ¶¶ 62-68).

In reply, Defendants contend that Plaintiff failed to address their argument that "Plaintiff could not actually, justifiably, or reasonably rely on Defendant's alleged misrepresentations due to the express limiting language contained in the Contract."  (Document No. 27, p. 4).  Defendants assert that because Section 9.1 severely limits the nature of misrepresentations set forth in the Contract, Plaintiff could not have relied on those representations to its detriment.  (Document No. 27, pp. 4-5) (citing Document No. 8, pp. 16-20).

Defendants argue that that there is no allegation supporting the first element of a negligent misrepresentation claim – justifiable reliance;  and similarly, there is no assertion that Plaintiff reasonably relied on Defendant's alleged misrepresentations to support a claim for fraudulent misrepresentation.  (Document No. 27, p. 5).

Based on the foregoing, Defendants conclude that Plaintiff's "glaring omissions" require the dismissal of both misrepresentation claims as to all Defendants.  Id.  (citing Suntrust Mortgage, inc. v. Busby, 2:09-CV-003-LHT-DLH, 651 F.Supp.2d, 472, 485-86 (W.D.N.C. 2009) (dismissing fraudulent misrepresentation and negligent misrepresentation claims for failing to plead reasonable or justifiable reliance).

The undersigned finds that Plaintiff has pled sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged";  and therefore, the misrepresentation claims should not be dismissed at this stage of the litigation.  See Iqbal, 556 U.S. at 678.

First, the undersigned is not persuaded by Defendants' arguments that the purported liability limitations in the Contract should be construed at this stage of the litigation to preclude

Plaintiff's misrepresentation claims. As Plaintiff notes, relevant caselaw holds that "[e]xculpatory provisions are construed against the party seeking their enforcement." Schenkel & Schultz, Inc., 362 N.C. at 274.

The undersigned finds Ada Liss Group v. Sara Lee Corp., 2010 WL 3910433 (M.D.N.C. 2010), to be instructive on this issue. Apparently, the defendants' argument in that case was similar to the instant case. Defendants' argument in Ada Liss Group was "in essence, that they have converted tort liability into contract liability and eliminated that liability through the exercise of the exculpatory provision." Ada Liss Group, 2010 WL 3910433, at *9. The Ada Liss Group decision stated that:

> The case law in North Carolina supports only the more limited proposition that exculpatory clauses eliminating liability for *ordinary negligence,* though strictly construed and disfavored, are enforceable under certain circumstances. . . .
> **There is absolutely no case law in North Carolina, on either the state or federal level, supporting the enforcement of exculpatory clauses for intentional wrongdoing**. …the Restatement of Contracts clearly states that "[a] term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy."

Ada Liss Group, 2010 WL 3910433, at *9 (emphasis added).

Here, Plaintiff has alleged intentional wrongdoing. The Sellers/Defendants "[i]n order to induce Purchaser to enter into this Agreement" provided representations, warranties, and covenants that included the following:

> (a) Except as noted herein, there is no pending or, to Seller's knowledge, threatened condemnation, litigation, assessment, or similar proceeding affecting any of the Properties or any part thereof, . . .

> (b) Seller has not received any written notice of any violation of any restrictive covenant, ordinance, regulation, law or statute of any governmental agency applicable to the Properties; . . .

14

(h) To Seller's knowledge, there are no Hazardous Materials (as hereinafter defined) on, in, under or emanating from the Properties, . . . to Seller's knowledge, no past or current releases of Hazardous Materials on, over, at, from, into, or onto the Properties; and Seller has no actual knowledge of any environmental condition, situation or incident on, at or concerning any of the Properties that possibly could give rise to an action to or liability under any law, ordinance or common law theory.

(Ex. A., § 9.1, Document No. 1-1, pp. 11-13). <u>See also</u> (Ex. A, § 5.1 (g), Document No. 1-1, p. 7) (Seller to provide Purchaser ". . . all notices received by any Seller concerning such Seller's Property compliance, or lack thereof . . . . ).

However, despite these and other representations and warranties, the Contract purports to limit liability to only the "Seller of the Property owned by it," and to limit the "Seller's knowledge" to only one individual, Mark Lerner, although no "conscious knowledge of any other individual or entity, shall be imputed" to Mark Lerner, and he does not have any liability or duties to the "Purchaser." (Document No. 1-1, p. 13). Moreover, this section of the Contract concludes that: "Purchaser hereby covenants that it will bring no action of any kind against such individual or any direct or indirect shareholder, partner, or member of a Seller related to or arising out of the representations and warranties set forth in this Agreement." <u>Id.</u> <u>See also</u> (Ex. A, § 9.5, (Document No. 1-1, p. 15) ("Further Limitations on Liability of the Parties").

In essence, Defendants take the position that pursuant to the Contract, at most one, if any, Defendants can be held responsible for the representations and warranties they made in inducing the Purchaser/Plaintiff to enter into the Contract. If upheld, this interpretation will exclude any liability for Harry Lerner who signed the acknowledgement of a "Notice of Brownfields" (Document No. 1-2) in 2006, *and* the Contract on behalf of multiple Defendants (Document No.

1-1, pp. 21, 25, 26) and the "First Amendment To Purchase And Sale Agreement" (Document No. 1-2) in 2022. <u>See</u> (Document No. 1, p. 8).

Second, viewing the Complaint in the light most favorable to Plaintiff, the undersigned is satisfied Plaintiff has adequately alleged the elements of negligent and fraudulent misrepresentation.[3] Plaintiff effectively presents allegations that Defendants knew or should have known about environmental contamination on at least one of the properties at issue, but withheld that information to induce Plaintiff to enter into the underlying Contract and deposit its Earnest Money.[4] Moreover, Plaintiff has alleged that it justifiably relied on Defendants' incorrect and inadequate information to enter into the Contract.

The undersigned finds a decision by this Court, and cited by Plaintiff, <u>T.W.T. Distributing, Inc. v. Johnson Products, Co., Inc.</u>, 3:13-CV-171-RJC-DSC, 966 F.Supp.2d 576 (W.D.N.C. 2013), to be instructive. In <u>T.W.T Distributing</u>, this Court declined to dismiss pending claims for breach of contract and negligent misrepresentation, noting in part that "[w]here breach of contract and negligent misrepresentation claims arise from the same conduct, the negligent misrepresentation must include an aggravating element such as fraud, malice, reckless indifference, oppression, insult, or willfulness. <u>T.W.T. Distrib., Inc.</u>, 966 F.Supp.2d at 581. Here, as in <u>T.W.T Distributing</u>, it appears that Plaintiff has adequately pled an aggravating element.

<u>T.W.T Distributing</u> also recognizes two other points applicable to this case. One, "[o]rdinarily, the question of whether an actor is reasonable in relying on the representations of

---

[3] Plaintiff suggests it has additional detail it could have provided, and is willing and able to amend the Complaint. (Document No. 23, p. 15). It is unclear why, to date, Plaintiff has not sought to amend the Complaint if it has additional factual content to support its claims.

[4] Although Plaintiff's arguments suggest that Defendants representations and warranties were "untrue, inaccurate, or incorrect" it does not address whether relief would be available pursuant to the Contract under § 9.3 "Breach of Warranties Prior to Closing." (Document No. 1-1, pp. 14-15).

another is a matter for the finder of fact." <u>T.W.T. Distrib., Inc.</u>, 966 F.Supp.2d at 582. And two, "[u]nder North Carolina law, a party to a contract owes the other contracting party a separate and distinct duty not to provide false information to induce the execution of the contract." <u>Id.</u> (citing <u>Schumacher Immobilien Und Beteiligungs AG</u>, 2010 WL 3943754, *2); <u>see also</u> <u>City of Hight Point v. Suez Treatment Solutions, Inc.</u>, 2020 WL 1307017, at *10-11 (M.D.N.C. Mar. 19, 2020) and <u>Jones v. BMW of North Am., LLC</u>, 2020 WL 5752808, at *9 (M.D.N.C. Sept. 25, 2020).

Based on Plaintiff's arguments, and the <u>Schenkel & Shultz</u>, <u>Ada Liss Group</u> and <u>T.W.T Distributing</u> cases, the undersigned will respectfully recommend that it would be premature to dismiss any of the misrepresentation claims against Defendants. Instead, it appears prudent for the Court to allow Plaintiff to conduct discovery, and possibly amend its Complaint, and to then reconsider Defendants' arguments at a later date, if necessary. It will likely be helpful to the ultimate resolution of this case for the parties to discover who knew what, and when, regarding hazardous materials on the properties, and what, if any, of that information was shared with Plaintiff before or during the Contract's negotiation and execution.

### 3. UDTPA

Defendants also contend that Plaintiff's UDTPA claim must be dismissed. (Document No. 8, pp. 20-22). Defendants note that the UDTPA claim is based on the misrepresentations discussed above and a dispute over the term(s) of the Contract related to the release of funds in escrow. (Document No. 8, p. 20). As such, Defendants assert that the parties' dispute "is neither an 'unfair and or deceptive act' nor is it 'in or affecting commerce,' as required to state a UDTPA claim in North Carolina." <u>Id.</u> According to Defendants, this case is, "**at most** a contractual dispute." <u>Id.</u>

Defendants' memorandum provides a helpful summary of the requirements for a UDTPA claim:

"The elements of an Unfair and Deceptive Trade Practices Act claim are: '(1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or to his business.'" *Brinkman v. Barrett Kays & Assocs., P.A.*, 575 S.E.2d 40, 44 (N.C. Ct. App. 2003) (internal citation omitted). The North Carolina Supreme Court has held that, along with the above cited elements, "some type of egregious or aggravating circumstances must be alleged and proved before the [Act's] provisions may [take effect]." *Carcano v. JBSS, LLC*, 684 S.E.2d 41, 50 (N.C. Ct. App. 2009) (quoting *Bus. Cabling, Inc. v. Yokeley*, 643 S.E.2d 63, 68 (N.C. Ct. App. 2007) (further quotations omitted)).

Here, Plaintiff has failed to allege facts sufficient to support the first element of its UDTPA claim. "A mere breach of contract, even if intentional, is not an unfair or deceptive act under Chapter 75." *Bob Timberlake Collection, Inc. v. Edwards*, 626 S.E.2d 315, 323 (N.C. Ct. App. 2006) (citing *Bartolomeo v. S.B. Thomas, Inc.*, 889 F.2d 530, 535 (4th Cir. 1989)). Under North Carolina law, it is well recognized that "actions for unfair or deceptive trade practices are distinct from actions for breach of contract . . .

(Document No. 8, pp. 20-21).

Defendants argue that "Plaintiff has failed to allege any facts to support the existence of an unfair or deceptive act." (Document No. 8 p. 21). Their view is that this claim is based on the alleged failure to release escrow funds in breach of the contract, which is a dispute about the Contract's terms – not an unfair or deceptive act. Id.

Next, Defendants argue that their alleged conduct is not "in or affecting commerce." (Document No. 8, pp. 21-22). Rather, Defendants contend this is a one-off, business-to-business dispute that is "wholly divorced from the context of consumer transactions." (Document No. 8, p. 22) (quoting PCS Phosphate Co., Inc. v. Norfolk Southern Corp., 559 F.3d 212, 225 (4th Cir. 2009)). "The UDTPA 'was intended to benefit consumers,' . . . but this dispute is between two sophisticated business entities." Id. (quoting PCS Phosphate, 559 F.3d at 225 (quoting Dalton v.

18

Camp, 548 S.E.2d 704, 710 (2001)).  Based on the foregoing legal authority, Defendants conclude that the UDTPA claim must be dismissed.  (Document No. 8, p. 22).

In response, Plaintiff contends it has set forth a valid claim under the North Carolina unfair and deceptive trade practices act.  (Document No. 23, pp. 11-14).  Plaintiff notes that in this case Defendants had actual notice of contamination on the property in question through a letter regarding a Notice of Brownfields Agreement, but Defendants withheld such evidence from Plaintiff.  (Document No. 23, p. 13).  Moreover, Plaintiff accuses Defendants of being "engaged in a scheme to deprive Plaintiff of its funds after proper termination after discovery of a Material Adverse Condition."  Id. (citing Document No. 1, ¶¶ 47-51).

Plaintiff relies on two cases from the North Carolina Court of Appeals that found there may be violations of N.C.Gen.Stat. § 75-1.1, along with breach of contract, where there were sufficiently aggravating circumstances.  Id. (citing Garlock v. Henson, 112 N.C. App. 243, 246 (1993) and Foley v. L & L Int'l, 88 N.C. App. 710, 714 (1988)).

Plaintiff concludes that its allegations, taken together, adequately state a claim of actions by Defendants, in or affecting commerce, which deceived Plaintiff to its detriment.  Id.

Defendants present two main arguments in their reply brief.  (Document No. 27, pp. 5-10).  First, they argue that Plaintiff has failed to refute that their claim is precluded by the provision in the Contract that "it would 'bring no action of any kind . . . related to or arising out of the representations and warranties set forth in this Agreement.'"  (Document No. 27, p. 6) (citing Ex. A, § 9.1, (Document No 1-1, pp. 11-13)).  Defendants suggest that the language in the Contract is so clearly and explicitly exculpatory it is binding on Plaintiff and must be enforced.  (Document No. 27, pp. 6-7).

Second, Defendants argue that the UDTPA claim is indistinguishable from the breach of contract claim and must fail for that reason as well. (Document No. 27, pp. 7-10). Defendants re-assert that Plaintiff has failed to allege any facts to support two of the three elements of a UDTPA claim – an unfair or deceptive act, in or affecting commerce. (Document No. 27, p. 8) (citing Document No. 8, pp. 20-22).

Defendants further argue that the cases relied upon by Plaintiff are inapposite because the dispute here is one of contract interpretation and because it does not involve a consumer transaction. (Document No. 27, p. 9). Defendants conclude that because "Plaintiff has alleged neither an unfair or deceptive act with some sort of aggravating circumstance nor an act that affects commerce, the Court must dismiss the UDTPA claim." (Document No. 27, p. 10).

Like the misrepresentation claims, the undersigned is not persuaded that Plaintiff's UDTPA claim should be dismissed at this time. Plaintiff has alleged sufficient factual content to state a plausible claim.

First, Plaintiff has alleged Defendants engaged in an unfair or deceptive act by knowingly withholding information about hazardous materials on the property in question to induce Plaintiff to enter into the Contract. See (Document No. 1, pp. 6-7). Moreover, "during the Phase I Assessment of the Lake Hill Apartment property, Defendants stated that they had no records or recollection of any releases . . . were unaware of any environmental issues with the property . . . [and] failed to produce any documentation." (Document No. 1, p. 9).

Despite Defendants' representations in the Contract, Plaintiff alleges that "Defendants were aware of and acknowledged receipt of the Notice of Brownfields Agreement concerning the Lake Hill property . . . signed by Harry Lerner as President of Lake Hills Corporation" on or about December 7, 2006, and "a 'Notice of Brownfields' [was] filed with the Mecklenburg County

20

Register of Deeds on March 19, 2007, related to the subject properties and property adjacent the subject properties." (Document No. 1, p. 8); see also (Document No. 1-2). A brownfields property or site is a property "at which expansion or redevelopment is hindered by actual environmental contamination or the possibility of environmental contamination and that is or may be subject to remediation under any State remedial program or that is or may be subject to remediation under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. § 9601, et seq.)."[5] N.C.Gen.Stat. § 130A-310.31.

Strikingly, Defendants do not seem to deny that they were aware of the contamination at the property in question, or that they knowingly withheld that information from Plaintiff. (Document Nos. 7, 8, 27). Rather, they take the position that the exculpatory provisions in the Contract and/or Plaintiff's option to conduct inspections of the property, waive any liability Defendants might have had for misrepresenting the status of the property.

Second, the undersigned is satisfied that Plaintiff has adequately alleged that the action in question was in or affecting commerce. "An act is 'in or affecting commerce' if the parties were 'engaged in an activity involving an exchange of some type in which a participant could be characterized as a seller.' Cent. Nat'l Gottesman Inc. v. Nakos Paper Products Inc., No. 3:18-CV-640-DSC, 2021 WL 3562898, at *3 (W.D.N.C. Aug. 11, 2021) (quoting Durling v. King, 554 S.E.2d 1, 4 (N.C.App. 2001)).

---

[5] See N.C.Gen.Stat. § 130A-310.35 (b) & (d) ("a prospective developer who enters into a brownfields agreement with the Department shall file a certified copy of the Notice of Brownfields Property in the register of deeds' office in the county or counties in which the land is located." "When a brownfields property is sold, leased, conveyed, or transferred, the deed or other instrument of transfer shall contain in the description section, in no smaller type than that used in the body of the deed or instrument, a statement that the brownfields property has been classified and, if appropriate, cleaned up as a brownfields property under this

This case involves parties who own, develop, and/or manage, multi-family residential properties and were engaged in a transaction whereby Plaintiff would acquire ten (10) multi-family properties from Defendants for $198,500,000.00. (Document No. 1, pp. 2-5). A relevant North Carolina Supreme Court case that addressed the sale of just two lots found that "the transaction at issue was indisputably a commercial land transaction that affected commerce in the broad sense" and that Plaintiff should prevail on its UDTPA claim. Bhatti v. Buckland, 328 N.C. 240, 246 (1991). More specifically, the Bhatti decision stated the following:

> to the limited extent that the transaction is depicted by the sparse facts in this record, it involved a buyer and seller in a commercial context to which the protections afforded by section 75–1.1, whether viewed literally or purposively, apply. The defendant did not prove that the transaction was anything other than a business activity well within the banks of the stream of commerce as broadly defined by the General Assembly in N.C.G.S. § 75–1.1. As such, plaintiff is entitled to the protection of the statute.
>
> We thus conclude that the sale fell within the ambit of the inclusive phrase "business activities, however denominated," N.C.G.S. § 75–1.1(b), and was therefore "in or affecting commerce" within the meaning and intent of that phrase as used in N.C.G.S. § 75–1.1(a). Because the jury found that the sale was procured by defendant's "fraudulent representation," plaintiff was entitled to treble damages. *Hardy v. Toler,* 288 N.C. at 309, 218 S.E.2d at 346.

Bhatti, 328 N.C. at 246–47 (1991).

Third, Plaintiff has adequately alleged that Defendants' actions have proximately caused injury. In short, Defendants allegedly fraudulently induced Plaintiff into the Contract and have since improperly withheld the return of $2,000,000.00 in Earnest Money. Id. At this stage, Plaintiff has adequately alleged injury.

To the extent Defendants contend this is, at most, a contractual dispute and that the UDTPA does not apply, the undersigned notes recent caselaw from this Court holding that under certain circumstances a UDTPA claim is not duplicative of a breach of contract claim. See Aseltine v.

22

Bank of America, 3:23-CV-235-MOC-WCM, 2023 WL 6305809 (W.D.N.C. Sept. 27, 2023).  In

Aseltine, this Court stated:

> While the UDTPA does not apply "to an individual who merely
> breaches a contract." Bumpers v. Cmty. Bank of N. Virginia, 367
> N.C. 81, 87–88 (2013), "[a] plaintiff may bring a UDTPA claim
> where a defendant's breach of contract involved deception and
> egregious and aggravating circumstances." Viza Elecs., LLC v.
> Paradigm Clinical Rsch. Inst., Inc., No. 3:22-CV-49-MOC-DCK,
> 2022 WL 4459836, at *6 (W.D.N.C. Sept. 23, 2022) (citing S. Atl.
> Ltd. P'ship of Tenn., L.P. v. Riese, 284 F.3d 518, 535 (4th Cir.
> 2002)) (additional citations omitted).  A breaching party commits an
> egregious or aggravated breach when it acts deceptively "in the
> circumstances of [the contract's] breach" **such as the formation of
> the contract** ….

Aseltine, 2023 WL 6305809, at *4 (W.D.N.C. Sept. 27, 2023) (emphasis added) (citing Software

Pricing Partners, LLC v. Geisman, No. 3:19-CV-195-RJC-DCK, 2020 WL 3249984, at *10

(W.D.N.C. June 16, 2020)).

Regarding Defendants' argument that exculpatory provisions in the Contract preclude a

UDTPA claim, the undersigned notes that this issue was addressed above in discussing the

misrepresentation claims and the undersigned is persuaded that dismissal on those grounds would

be premature.

Based on the foregoing, the undersigned will respectfully recommend that the motion to

dismiss Plaintiff's UDTPA claim also be denied.

**B.  Breach of Contract Claim**

Defendants also argue that Plaintiff's breach of contract claim should be dismissed.

(Document No. 8, pp. 22-25).  Defendants contend that Plaintiff has failed to plead facts to

plausibly allege the existence of a material adverse condition.  Id.  Defendants note that pursuant

to the plain language of the Contract:

a Material Adverse Condition exists on the property under only one circumstance: the presence of "environmental matters or conditions which would **require** more than $50,000 to cure or remediate, **in the reasonable estimate of the QEP**." Ex. A, § 3.1 (emphasis added). Indeed, Plaintiff's Complaint lacks any allegation that the QEP ever estimated the cost to remediate the alleged environmental issues at all, much less that it would cost more than $50,000. Without such an allegation, Plaintiff's breach of contract claim must be dismissed because Plaintiff cannot allege the existence of a Material Adverse Condition—the lynchpin to its entire case.

(Document No. 8, p. 23).

Defendants note that the Phase II Report attached to the Complaint does not include "an estimate that the remediation would cost more than $50,000," nor "a statement that remediation is required at all under North Carolina law." (Document No. 8, pp. 24-25). Defendants conclude that Plaintiff's failure to "plausibly allege the existence of a Material Adverse Condition" is fatal to its claim. (Document No. 8, p. 25).

In response, Plaintiff contends it has asserted a valid breach of contract claim. (Document No. 23, pp. 5-6). Specifically, Plaintiff states that it:

has alleged that Defendants have breached the contract by failing to return its escrow funds despite the fact that environmental contamination was revealed at the Lake Hills property which objectively will cost over $50,000.00 to remediate constituting a Material Adverse Condition. (See Compl. ¶ 48.) The contract required the return of escrow funds if there is a Material Adverse Condition and Defendants refused to return Plaintiff's funds constituting a breach. Defendants scheming to unjustly enrich themselves in the amount of $2 million dollars also breached the contract since it violated the implied duty of good faith and fair dealing which is part and parcel of every contract. *See Maaco Franchisor SPV, LLC v. Sadwick*, 3:20-cv-147, 2020 WL 4468727 (W.D.N.C. 2020).

(Document No. 23, pp. 5-6).

In addition, Plaintiff contends that Defendants are improperly seeking "a determination of their own interpretation of the contract." (Document No. 23, p. 6). Plaintiff argues that Defendants

are attempting "to read additional requirements into the contract with regard to the definition of Material Adverse Condition to add in an additional submission of an estimate of costs as opposed to a typical Phase II environmental assessment." Id. "Defendants' interpretation manufactures language relating to the actual condition of property to one that only means that there is a written estimate to remediate the condition costing more than $50,000 provided to Defendants." Id.

Plaintiff notes that Defendants do not contest that "should remediation occur to clean up the plume of drycleaning and petroleum constituent compounds," it would cost more than $50,000, "especially since the plume of contamination is flowing down gradient to the subject residential property." Id. Plaintiff suggests that, at the very least, the "Material Adverse Condition can be construed as ambiguous since there are multiple interpretations of the contractual language that make sense." (Document No. 23, p. 8). Plaintiff further suggests that Defendants' position ignores reality because it "denies the objective conditions o[n] the property of hazardous chemical contamination and is unreasonable." Id.

Plaintiff then notes that, contrary to Defendants' interpretation of the Contract, "there is no specific contractual provision regarding the procedure for any third-party to submit any estimate to Defendants and indeed the Phase II Report was to assess the objective environmental condition of the property." Id.

In reply, Defendants first argue that the Contract "unambiguously defines Material Adverse Condition as requiring a reasonable estimate by the QEP, yet Plaintiff's Complaint cannot point to a single allegation of such an estimate existing at all." (Document No. 27, p. 11). Defendants assert that they "directly quoted the Contract's definition of a Material Adverse Condition to show that a Material Adverse Condition exists only if the QEP provides a 'reasonable estimate' (written

or otherwise) of the remediation cost that exceeds the Contract's $50,000 materiality threshold, which never occurred according to the facts alleged in the Complaint." Id.

According to Defendants, a "contract is only ambiguous when 'either the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations.'" Id. (quoting Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC, 723 S.E.2d 744, 748 (N.C. 2012) (quoting Schenkel, 658 S.E.2d at 921)). "[A] contract must be 'fairly and reasonably susceptible to either one of the constructions asserted by the parties' to be ambiguous." (Document No. 27, p. 12) (quoting St. Paul Fire & Marines Ins. Co. v. Freeman-White Assocs., Inc., 366 S.E.2d 480, 484 (N.C. 1988)).

> Here, the Contract could not be clearer: a Material Adverse Condition only exists when there are "environmental matters or conditions which would require more than $50,000 to cure or remediate, **in the reasonable estimate of the QEP**." Compl. Ex. A, § 3.1 (emphasis added). Thus, unless the QEP offered a "reasonable estimate" that the alleged contamination would cost more than $50,000 to remediate, a Material Adverse Condition **cannot** exist. Id.

> Notably, despite arguing that the Contract's language was ambiguous, Plaintiff **failed to allege that the QEP provided a reasonable estimate**. In fact, **Plaintiff failed to even offer a viable competing interpretation of the clause at issue**.

(Document No. 27, p. 12).

As such, Defendants are not persuaded there are "multiple interpretations of the contractual language that make sense." Id.; see also (Document No. 23, p. 8).

Finally, Defendants argue that they did not violate the implied covenant of good faith and fair dealing because Plaintiff can point to no duty in the Contract they violated. (Document No. 27, p. 13).

> Here, the Contract unambiguously requires Defendants to return the funds in escrow only after the finding of an environmental

> condition that the QEP reasonably estimates will cost more than $50,000 to remediate. Compl. Ex. A, § 3.1. Because no such estimate has ever been made, Plaintiff has no basis to demand the escrowed funds returned. Thus, Plaintiff attempts to use the implied covenant to "write into the Agreement obligations that do not exist." *Drummond*, 3 F.4th at 611. Indeed, Defendants could not, as a matter of law, have violated the implied covenant of good faith and fair dealing by refusing Plaintiff's unfounded demand to return the funds in escrow.

(Document No. 27, p. 14).

Defendants conclude that the Court should not allow this case to proceed to discovery "because the plain language of the contract dooms every claim."

The undersigned finds that this issue presents a close call.

In pertinent part the Contract states:

> As used herein, "**Material Adverse Condition**" means **either (x)** a recommendation in a Phase I environmental site assessment (by a qualified environmental professional (the "QEP")) to conduct a Phase II environmental site assessment or other further testing, which further testing reveals the existence of environmental matters or conditions that require more than $50,000 to cure or remediate, **in the reasonable estimate of the QEP**
> . . .
> **or (y)** other findings which reveal the existence of environmental matters or conditions which would require more than $50,000.00 to cure or remediate**, in the reasonable estimate of the QEP**.

(Ex. A., § 3.1, Document No. 1-1, p. 4) (emphasis added).

The undersigned finds that both sides raise important points. The crux of Defendants' argument is that Plaintiff has yet to allege that there is a "reasonable estimate of the QEP" in any form. (Document Nos. 8, 27). However, Defendants' description of the Contract language is misleading – the Contract does not state that the "QEP provides" an estimate, or that it would be "(written or otherwise)." See (Document No. 27, p. 11). As Plaintiff observes, "there is no specific

27

contractual provision regarding the procedure for any third-party to submit any estimate to Defendants." (Document No. 23, p. 8).

In the Complaint, Plaintiff acknowledges, and quotes from the Contract, that the definition of "Material Adverse Condition" – a prerequisite for the return of its Earnest Money – requires environmental conditions that require more than $50,000 to cure or remediate, *in the reasonable estimate of the QEP*. (Document No. 1, ¶ 28). Nevertheless, without citing any estimate of the QEP, Plaintiff concludes that the "related environmental matters or impacts on the property, would cost well over $50,000.00, and thus, Plaintiff is entitled to the return of its Earnest Money." (Document No. 1, ¶ 38).

The undersigned finds that Plaintiff presents a plausible argument that it would cost in excess of $50,000 to cure or remediate the environmental conditions at the subject property. Since the Contract does not provide a required form of an estimate, or any method of submission of an estimate by the QEP, it is unclear at this stage whether or not there was "a reasonable estimate of the QEP" that there were "matters or conditions that would require more than $50,000 to cure or remediate." However, Plaintiff's pleading does not include the precise language that the Contract requires to establish a "Material Adverse Condition," and its briefing does not adequately explain the failure to identify the existence of a "reasonable estimate of the QEP."

Despite the apparent deficiencies in Plaintiff's pleading, after considering all the circumstances of this case, the undersigned recommends that dismissal of the breach of contract claim be denied without prejudice. The undersigned further recommends that the parties be directed to conduct at least some initial discovery, and that Plaintiff then be allowed to file an Amended Complaint. Plaintiff is respectfully advised that if it cannot allege the presence of a "Material Adverse Condition"– as defined by the Contract – at the time it demanded the return of

its Earnest Money, its breach of contract claim, at least on that basis, may be vulnerable to a future dispositive motion.

## IV.  RECOMMENDATION

**FOR THE FOREGOING REASONS**, the undersigned respectfully recommends that "Defendants' Motion To Dismiss" (Document No. 7) be **DENIED WITHOUT PREJUDICE**.

## V.  TIME FOR OBJECTIONS

The parties are hereby advised that pursuant to 28 U.S.C. § 636(b)(1)(C), and Rule 72 of the Federal Rules of Civil Procedure, written objections to the proposed findings of fact, conclusions of law, and recommendation contained herein may be filed within **fourteen (14) days** of service of same.  Responses to objections may be filed within fourteen (14) days after service of the objections.  Fed.R.Civ.P. 72(b)(2).  Failure to file objections to this Memorandum and Recommendation with the District Court constitutes a waiver of the right to *de novo* review by the District Court.  Diamond v. Colonial Life, 416 F.3d 310, 315-16 (4th Cir. 2005);  United States v. Benton, 523 F.3d 424, 428 (4th Cir. 2008).  Moreover, failure to file timely objections will preclude the parties from raising such objections on appeal.  Id.  "In order 'to preserve for appeal an issue in a magistrate judge's report, a party must object to the finding or recommendation on that issue with sufficient specificity so as reasonably to alert the district court of the true ground for the objection.'"  Martin v. Duffy, 858 F.3d 239, 245 (4th Cir. 2017) (quoting United States v. Midgette, 478 F.3d 616, 622 (4th Cir. 2007)).

**IT IS SO RECOMMENDED**.

Signed: November 1, 2023

David C. Keesler
United States Magistrate Judge